## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

C & H Liquor Store, Inc.,

        Plaintiff,     Case No. 1:16-cv-03052

v.            Michael L. Brown
            United States District Judge

Harleysville Preferred Insurance
Company,

        Defendant.

_____/

## OPINION AND ORDER

Plaintiff C & H Liquor Store, Inc. ("C&H") claims Defendant Harleysville Preferred Insurance Company ("Harleysville") breached a commercial insurance policy by refusing to pay C&H for various forms of property damage and lost income after a fire damaged his business. Harleysville moved for summary judgment. (Dkt. 27.) The Court grants in part and denies in part that motion.

## I. Factual and Procedural Background

C&H operates a liquor store out of a building that it leases. (Dkt. 39 ¶ 2.) A fire erupted at the business in June 2014, destroying the right

side of the building, causing smoke damage to the left side, and forcing C&H to close from June 29, 2014, through mid-August of that year. (*Id.* ¶ 4.)

C&H was insured under a policy issued by Harleysville. (Dkt. 27-3 ¶ 1.) The policy covered various kinds of damage to the business and its property. (*See* Dkt. 28-4.) The policy had a limit of $400,000, meaning Harleysville would pay no more than that for losses and damages arising from a single occurrence. (*Id.* at 6.) It provided coverage above that amount, however, for specific other losses and expenses. Section I, provision A.5.a(4), for example, provided another $10,000 in coverage for debris removal expenses. (*Id.* at 34.) That provision specifically stated that the $10,000 benefit was on top of the $400,000 policy limit. (*Id.*) Other provisions made additional coverage above the policy limit available for expenses arising from extended business interruption and extra expenses incurred during a period of restoration. (*Id.* at 37, 38.) Yet another provision made clear that certain expenses like fire department service charges and pollutant clean up and removal expenses were not subject to the $400,000 policy limit. (*Id.* at 50.)

C&H notified Harleysville of the fire and submitted claims for business personal property, debris removal, and lost business income. (Dkt. 27-3 ¶ 3.) In July and August 2014, Harleysville paid C&H $400,000 as the policy limit for the lost business property, including the damage to the store's contents and improvements and emergency services. (Dkts. 27-2 at 5, 19; 27-3 ¶ 4.) In September 2014, C&H asked Harleysville to pay invoices for security services and restoration work, smoke clean up, emergency repairs, and other work performed on the store. (Dkt. 39 at 4, 6–27.) Harleysville reviewed the invoices and paid C&H $10,000 — the policy limit for debris removal. (Dkts. 27-2 at 5, 19; 27-3 ¶ 4.)

In July 2014, Harleysville requested documents from C&H, including (1) a summary of monthly revenues from January 2012 through June 2014, (2) daily revenues from June 1 through 29, 2014, (3) monthly profit and loss statements from January 2013 through the time of the request and going forward, and (4) C&H's 2012 and 2013 federal income tax returns. (Dkts. 27-2 at 3; 27-3 ¶¶ 5–6.) Harleysville sought this information to assess any later claim for ongoing business losses, a loss not subject to the $400,000 policy limit in some cases. In September 2014,

C&H said it had provided the requested information but was not ready to settle its claim for ongoing business losses. (Dkts. 34-1 at 86; 39 at 32.)[1] In late 2014 and early 2015, Harleysville repeatedly requested that C&H provide information supporting its business income claim. (Dkt. 27-2 at 5, 8, 10, 14, 16.) Harleysville warned C&H that it would close the file and assume C&H no longer intended to pursue such a claim if C&H did not respond by November 2014, later extending the deadline to March 19, 2015, and eventually April 19, 2015. (*Id*. at 8, 14, 20.) C&H never responded, and Harleysville closed the lost business income claim in April 2015. (Dkt. 28-1 ¶ 8.)

C&H sued Harleysville in the State Court of Fulton County, Georgia, in June 2016, alleging a single claim for breach of contract. (Dkt. 1-1 at 3–6.) Harleysville removed the action to federal court and, after discovery, moved for summary judgment. (Dkts. 1, 27.) C&H opposed that motion. (Dkt. 37.)

---

[1] C&H also produced copies of its 2012 and 2013 federal tax returns, sales summaries from 2012 to June 2014, and its financial statements from 2013 and January–June 2014 during discovery. (Dkt. 34-1. at 87–106, 108–119.)

## II. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial.'" *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1186–87 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

The moving party bears the initial responsibility of asserting the basis for his motion. *See Celotex Corp.*, 477 U.S. at 323. The movant is not, however, required to negate the non-movant's claim. Instead, the moving party may meet his burden by "'showing'—that is, pointing to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has carried its burden, the non-moving party must present competent evidence that there is a genuine issue for trial. *Id.* at 324.

The Court views all evidence and factual inferences in a light most favorable to the non-moving party. *See Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). But the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson*, 477 U.S. at 248. "The requirement is that there be no *genuine* issue of *material* fact." *Id.* The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III. Discussion

"An insurance policy is simply a contract, the provisions of which should be construed as any other type of contract." *RLI Ins. v. Highlands on Ponce, LLC*, 635 S.E.2d 168, 170–71 (Ga. Ct. App. 2006) (quoting *Hunnicutt v. S. Farm Bureau Life Ins. Co.,* 351 S.E.2d 638, 640 (Ga. 1987). Courts must consider an insurance policy as a whole, give effect to each provision, and interpret each provision to harmonize with each other. *See ALEA London Ltd. V. Woodcock*, 649 S.E.2d 740, 745 (Ga. Ct. App. 2007); *see also* GA. CODE ANN. § 13-2-2(4) ("the whole contract should be looked to in arriving at the construction of any part"). "Construction

of the contract, at the outset, is a question of law for the court." *Id*. at 171 (citing *Deep Six, Inc. v. Abernathy,* 538 S.E.2d 886, 888 (Ga. Ct. App. 2000)). "The court undertakes a three-step process in the construction of the contract, the first of which is to determine if the instrument's language is clear and unambiguous." *Id*. (citing *Woody's Steaks v. Pastoria,* 584 S.E.2d 41, 43 (Ga. Ct. App. 2003)). If the language is unambiguous, the court simply enforces the contract according to the terms, and looks to the contract alone for the meaning. *Id*.

> [I]f the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

*CareAmercia, Inc. v. S. Care Corp*., 494 S.E.2d 720, 722 (Ga. Ct. App. 1997). Georgia courts have defined "ambiguity" as duplicity, indistinctness, an uncertainty of meaning or expression used in a written instrument, and found that it also signifies doubtful or uncertain nature or being open to various interpretations. *See RLI Ins*., 635 S.E.2d at 171; *Early v. Kent*, 108 S.E.2d 708, 709 (Ga. 1959). Ambiguities in an insurance contract are strictly construed against an insurer, and any exclusions from coverage are likewise strictly construed. *ALEA London*

*Ltd.*, 649 S.E.2d at 745 (quoting *Guar. Nat. Ins. Co. v. Brock*, 474 S.E.2d 46, 49 (Ga. Ct. App. 1996)). And, where possible, insurance contracts should be read in accordance with an insured's reasonable expectations. *Id.*

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *SAWS at Seven Hills, LLC v. Forestar Realty, Inc.*, 805 S.E.2d 270, 274 (Ga. Ct. App. 2017) (quoting *Dewrell Sacks, LLP v. Chi. Title Ins. Co.*, 749 S.E.2d 802, 806 (Ga. Ct. App. 2013)). The parties dispute the first two elements.

At the outset, the parties dispute what evidence the Court should consider in deciding the summary judgment motion. Harleysville objects to any consideration of damages calculations provided by C&H's owner, Tea Mo, in an affidavit he filed in opposing summary judgment; C&H's sales summaries attached as an exhibit to that affidavit; and C&H's First Amended Response to First Interrogatories. (Dkts. 36-1; 39 ¶¶ 6–8, pp. 28–31; 40 at 1–2, 5, 8, 10). The sales records, and the discussion of the records in Mr. Mo's affidavit, C&H's statement of facts, and its amended discovery responses, show C&H's sales from January 2013 through June

2015 and provide an estimate of C&H's business loss during the twelve months following the fire. (Dkts. 36-1; 39 ¶¶ 6–8, pp. 28–31.) Harleysville claims C&H did not produce these documents and information during discovery. (Dkt. 40 at 1–2, 5, 8, 10.) It claims C&H first provided this information in response to Harleysville's motion for summary judgment and the Court should not consider it. C&H admits it did not produce this information during discovery but says its failure should be excused. (Dkt. 37 at 9.)

Harleysville says C&H violated Rules 26 and 37 of the Federal Rules of Civil Procedure. Rule 26(a)(1)(A)(ii) provides

> Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties: a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment . . . .

Parties also must supplement their Rule 26 disclosures at appropriate intervals. *See* FED. R. CIV. P. 26(e)(1). Parties who fail to satisfy these disclosure and supplementation requirements are prohibited, under Rule 37(c)(1), from using the undisclosed evidence "at trial, at a hearing, or on a motion," unless the failure is harmless. FED. R. CIV. P. 37(c)(1); *see also*

*Cooley v. Great S. Wood Preserving*, 138 F. App'x 149, 161 (11th Cir. 2005). The "burden rests upon the non-producing party to demonstrate that its actions were substantially justified or harmless." *United States v. Batchelor-Robjohns,* No. 03–20164–CIV, 2005 WL 1761429, at *2 (S.D. Fla. June 3, 2005); *see also Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009).

During discovery, Harleysville asked C&H to identify all damages it sought to recover under its breach of contract claim. (Dkt. 34-2 at 9.) C&H responded that it would supplement its response to provide the actual damages it suffered from its business loss. (*Id.*) C&H did not do so until it responded to Harleysville's motion for summary judgment almost two months after the discovery period ended.[2] (Dkts. 36-1 at 9; 40 at 1–2.) Harleysville argues C&H should have produced such documents and information in its Rule 26 disclosures. *See* FED. R. CIV. P. 26(a)(1)(A)(ii). Harleysville also contends that, even now, C&H has produced no underlying receipts or documents to support the information

---

[2] The discovery period ended on August 11, 2017, after the Court granted the parties a three-month extension beyond the original discovery deadline. (Dkts. 24 at 1; 25 at 1.)

in its sales summaries.  Harleysville further argues that under Georgia insurance law, C&H should have provided this information in response to its repeated inquires during its initial investigation of C&H's claims.

C&H counters that it provided many financial documents in its response to Harleysville's request for production of documents.  (Dkt. 37 at 9.)   The record shows C&H produced 2012–June 2014 sales summaries, tax returns from 2012 and 2013, and 2013–June 2014 financial statements.  (Dkt. 34-1 at 8, 90–106, 108–119.)  But none of these documents provided any information about C&H's business losses *after* the fire occurred in June 2014.  C&H also never filed with the Court any initial disclosures under Rule 26(a) or supplemental disclosures under Rule 26(e).  Harleysville thus had no opportunity during discovery to analyze C&H's records from after the fire or conduct additional document discovery about ongoing business losses.[3]  Harleysville also had no opportunity to depose any of C&H's representatives about its

---

[3] C&H attached sales summaries from July 2014 through June 2015 as exhibits to Mr. Mo's affidavit (Dkt. 39 at 30–31) and a description of its actual damages for business loss in its First Amended Response to First Interrogatories (Dkt. 36-1 at 9).  It never produced these items during the discovery period.

alleged business losses. C&H has failed to explain its failure to disclose timely this information and cannot now cure its error.

Under these circumstances, C&H's failure to disclose or produce this evidence was neither harmless nor substantially justified. As Harleysville notes, it was both unfair and prejudicial for C&H to produce records supporting its claim for business loss only after forcing Harleysville to defend this lawsuit, after the close of discovery, and in response to summary judgment briefing. Mr. Mo asserts in his affidavit that C&H's sales summaries from July 2014 through June 2015 were "made at or near [that] time," yet C&H delayed providing the information to Harleysville for more than two years. (Dkt. 39 ¶ 6.)

C&H argues it was justified in failing to provide the information and documents because Harleysville never complained that C&H needed to update its discovery responses or noticed the deposition of any of its representatives. (Dkt. 37 at 10–11.) But C&H had to produce the evidence to support its claims during discovery period and to comply with the Federal Rules of Civil Procedure. C&H also argues that its "failure" was harmless, because it has amended its discovery responses and

produced the documents before trial. This failure was not harmless for the reasons discussed.

The Court thus sustains Harleysville's objections to the calculation of damages in paragraph eight of Tea Mo's affidavit, C&H's sales summaries from July 2014 to June 2015 attached as pages thirty and thirty-one in an exhibit to that affidavit, and C&H's First Amended Response to First Interrogatories. (Dkts. 36-1; 39 ¶ 8, pp. 30–31.) The Court will not consider this evidence when evaluating Harleysville's motion for summary judgment. *See Cooley*, 138 F. App'x at 161 (11th Cir. 2005) (per curiam) (striking undisclosed affidavits was not an abuse of discretion); *see also Johnson v. Gwinnett Cty. Sch. Dist.*, No. 1:11-cv-471, 2012 WL 5987584, at *2 (N.D. Ga. Oct. 17, 2012) (sustaining objections to affidavit and documents not produced during discovery), *adopted by*, No. 1:11-cv-471, 2012 WL 5987581 (N.D. Ga. Nov. 28, 2012).

Harleysville asserts that no evidence supports any of C&H's claims for further payments under the policy. (Dkt. 27-1 at 8–12.) C&H seeks payment for losses and expenses arising from debris removal, fire department service charges, water damage, extra expense, pollutant clean up or removal, glass expense, and business interruption insurance.

(Dkt. 1-1 ¶ 9.)  C&H abandoned its claim for fire department service charges by not raising it when opposing Harleysville's motion for summary judgment.  *See B & D Nutritional Ingredients, Inc. v. Unique Bio Ingredients, LLC*, 758 F. App'x 785, 790 (11th Cir. 2018) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (same).  The Court will address each of C&H's remaining claims.

### 1.    Business Personal Property

The policy states that Harleysville will pay up to $400,000 for damage to the business and its personal property.  (Dkt. 28-4 at 6, 100.) Harleysville has already paid C&H this amount.  (Dkt. 28-1 ¶ 4.)  C&H argues that the contents limit "did not reach the level of the amount of contents it lost in the fire."  (Dkt. 37 at 6.)  C&H, however, identified no evidence showing the value of contents it lost or any provision in the policy that would permit it to recover losses above the $400,000 limit for those items.

Because no reasonable jury could find that Harleysville has breached the policy's provisions governing reimbursement for damage to

business personal property, Harleysville is entitled to judgment as a matter of law.

## 2. Debris Removal

C&H claims Harleysville breached the policy agreement by failing to pay all of its expenses for debris removal following the fire. Under policy Section I, provision A.5.a.(4)(a), Harleysville agreed to

> pay up to an additional $10,000 for debris removal expense, for each location, in any one occurrence of physical loss . . . if . . . [t]he total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(Dkt. 28-4 at 34). The policy further provided that Harleysville would never pay more than the $400,000 insurance limit plus $10,000 for direct physical loss or damage and debris removal expenses. (*Id.*)

Harleysville paid C&H the $400,000 insurance limit and another $10,000 for debris removal. (Dkts. 27-3 ¶ 4; 28-1 ¶ 4.) Harleysville thus complied with the requirements in policy provision 5.a.(4) by paying C&H the money it was entitled under the additional coverage for debris removal.

C&H argues the Court should not grant summary judgment to Harleysville because "there is a fact question as to whether there is

coverage for additional amounts for [ ] various damage items," including additional coverage for debris removal. (Dkt. 37 at 5.) Without citing any specific document or fact, C&H generally directs the Court to the documents accompanying Mr. Mo's affidavit. (*Id*. at 6.) Some invoices attached to the affidavit suggest that C&H paid to have smoke damage cleaned and debris removed. (Dkt. 39 at 7, 10.) Those documents are irrelevant. Even if C&H spent over $10,000 to remove debris from its store, under policy provision A.5.a.(4) the total payment it can receive for direct physical loss or damage and debris removal cannot exceed the $410,000 Harleysville has already paid. (Dkt. 28-4 at 34.)

No reasonable jury could find Harleysville breached the policy's provisions governing debris removal, and Harleysville is entitled to judgment as a matter of law on this claim.

### 3. Water Damage

Section I, provision A.5.e. of the policy provides additional coverage for covered water damage. It states that Harleysville agreed to "pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or substance escapes." (Dkt. 28-4 at 36.) The policy defines water damage as

"accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance . . . containing water or steam. (*Id.* at 60.) The policy does not provide for coverage beyond the $400,000 limit for water damage. In other words, the policy includes any losses for water damage within the $400,000 limit.

Harleysville argues that there was no covered water loss in this claim, because the fire caused the loss and all resulting damages. (Dkt. 40 at 14.) As with its other claims under the policy's additional coverage provisions, C&H does not discuss the water damage it claims occurred or identify any documents or evidence supporting its claim. C&H does, however, state that the policy has a subheading for additional coverage for water damage and that Mr. Mo's affidavit and the accompanying documents create a fact issue about whether there is coverage under policy. (Dkt. 37 at 5–6.)

Mr. Mo states that the work performed on the store included water extraction. (Dkt. 39 ¶ 4.) An invoice dated July 10, 2014, includes charges for "Water Extraction, Cleaning up broken bottles cans dirt and debris on the floor [sic]." (Dkts. 34 at 26; 39 at 10.) Another invoice dated

July 25, 2014, includes charges for emergency repairs to a PVC water pipe the fire department broke while extinguishing the fire. (Dkts. 34 at 15; 39 at 11.) C&H presents no evidence to identify the source of the extracted water, show the broken PVC water pipe was part of a system containing water or steam on the day of the loss, or even allege that water from the pipe caused any damage. It presents no evidence from which a jury could conclude it suffered water damage as that term is defined in the policy.

Even if it could, C&H would not be entitled to more payments because Harleysville has already paid C&H the $400,000 insurance policy limit. Again, the insurance contract does not make additional coverage available for water damage. Because no reasonable jury could find Harleysville has breached the policy's water damage coverage provision, Harleysville is entitled to judgment as a matter of law.

### 4. Extra Expense

Section I, provision A.5.(g) of the policy states that Harleysville will cover "Extra Expenses" C&H incurred due to physical loss or damage to property. It provides this coverage beyond the $400,000 coverage limit. It states:

**(1)** We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

**(2)** Extra Expense means expense incurred:

> **(a)** To avoid or minimize the suspension of business and to continue "operations":
>
> > **(i)** At the described premises . . . .
>
> **(b)** To minimize the suspension of business if you cannot continue "operations".
>
> **(c)** To
>
> > **(i)** Repair or replace any property . . . .
>
> to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage **f.** Business Income.

. . .

**(4)** We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance of Section **I** - Property.

(Dkt. 28-4 at 38.)

Neither Harleysville nor C&H directly address C&H's claim for coverage of extra expense. Harleysville generally asserts that it has paid its limits for the losses C&H now claims as "additional coverages." (Dkt.

40 at 13.) C&H counters that the "additional coverages" include the work described in paragraphs two and three of Mr. Mo's affidavit and the accompanying documents. (Dkt. 37 at 6.)

Mr. Mo describes various repairs in paragraph two of his affidavit, including restoration, smoke clean up, installation of ventilation fans, water extraction, and emergency repair services. (Dkt. 39 ¶ 2.) These repairs could fall within the policy's definition of "extra expense," provided they minimized the suspension of C&H's business and reduced the amount of loss that otherwise would have been payable under the additional coverage for business income. Because the additional coverage for extra expense is not subject to the insurance limits for damages to property, C&H could recover its extra expenses even though it has already received the $400,000 insurance policy limit.

The policy, however, limits the time during which C&H could recover extra expenses to the "period of restoration." (Dkt. 28-4 at 38.) Here, the "period of restoration" began just after the fire occurred, June 29, 2014, and ended on the date when C&H's store should have been "repaired, rebuilt or replaced with reasonable speed and similar quality." (*Id*. at 14, 59.) The parties dispute the date on which the period should

end. Harleysville asserts that the "period of restoration" ended four months after the fire because C&H should have completed the repairs by then. (Dkts. 27-1 at 4–5; 27-2 at 5, 8, 10, 12, 20.) C&H contends that the "period of restoration" should include the entire twelve months after the fire because restoration continued for that entire period. (Dkt. 37 at 7.) A finder of fact will need to determine the "period of restoration."

The Court denies Harleysville's motion for summary judgment on C&H's claim under the policy's additional coverage for extra expense.

### 5. Pollutant Clean Up/Removal

Under Section I, provision A.5.(h) of the policy, Harleysville agreed to pay C&H's expenses to "extract 'pollutants' from land or water at the described premises." (Dkt. 28-4 at 10, 38–39.) The policy defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (*Id.* at 74.) Again, this coverage is on top of the $400,000 policy limit. (*Id.* at 50.)

Harleysville argues that C&H has not shown that any "pollutants" were involved in its loss or were extracted from land or water. (Dkt. 40 at 14.) Harleysville is correct. C&H never identified or mentioned any

pollutants, other than to assert the policy contains more coverage for "pollutant clean up/removal." (Dkts. 37 at 5; 39 at 32.) C&H's failure to provid evidence from which a jury could conclude it incurred these expenses is fatal to its claims.

The Court grants Harleysville motion for summary judgment as to any claims for pollutant clean up or removal expenses.

### 6. Glass Expense

The policy defines business personal property to include exterior building glass only if a tenant owns the glass or the glass is in the tenant's care, custody, or control and "no Limit of Insurance is shown in the Declarations for Building property." (Dkt. 28-4 at 32.) Under Section I, provision A.5.(n) of the policy, Harleysville agreed to "pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed." (*Id*. at 41.)

Harleysville argues that C&H has provided no information showing that there was a delay in the repair or replacement of any damaged glass or that it was responsible for the building glass instead of the owner — two conditions precedent to C&H's ability to recover glass expenses. (Dkt. 40.) Harleysville is correct.

C&H leased the premises in which it operated its liquor store. (Dkt. 27-3 ¶ 3.) C&H paid to have windows and doors boarded up. (Dkts. 34-1 at 25; 39 at 9.) Under the policy, however, those exterior windows are not C&H's business personal property, because C&H has not shown — or even asserted — that it owned, cared for, controlled, or had custody over the exterior building glass. Because the policy only covers C&H's business personal property and not the actual building it leased, C&H cannot recover its expenses to board up the broken windows in the store under the additional coverage for glass expense.

Even if C&H did own, care for, control, of have custody over the exterior building glass, the limit of insurance for business personal property would still prohibit it from recovering its glass expenses. No provision of the policy makes additional coverage available for any such expenses. C&H has received everything to which it is entitled for this type of loss. No reasonable jury could find Harleysville has breached the glass expense additional coverage provisions in the policy, and Harleysville is entitled to judgement as a matter of law.

### 7.    Business Income

Under Section I, provision A.5.(f) of the policy, Harleysville agreed to "pay for the actual loss of Business Income [C&H] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration.'" (Dkt. 28-4 at 10, 36–38.) The parties dispute both the duration of the applicable "period of restoration" and whether C&H provided Harleysville with evidence supporting its claim for loss of business income promptly. Harleysville also contends that C&H breached its obligations under the policy by failing to respond to Harleysville's repeated requests for this evidence.

After the fire, C&H had to permit Harleysville to examine and make copies from its books and records. (Dkt. 28-4 at 52, 76.) When Harleysville requested information to investigate a claim, C&H needed to send a signed, sworn proof of loss containing the information within sixty days after the request. (*Id.* at 52.) C&H also had to cooperate with Harleysville's investigation of C&H's claim. (*Id.*) The policy precluded C&H from suing Harleysville unless it had fully complied with these duties and all of the policy's terms. (*Id.*)

The policy entitled Harleysville to receive access to C&H's books and records and proof of its loss, including the requested documents showing C&H's profits and losses from the date of the fire through the end of the period of restoration. C&H provided some, but not all, of the financial documents Harleysville requested before discovery closed.

"Under Georgia law, an insured is required 'to provide any material information to the insurer that the insurer is entitled to receive under the insurance policy,' and a failure to provide the requested information, 'absent an excusable failure to do so, constitutes a breach of the insurance contract' that bars recovery by the insured." *R&G Invs. & Holdings, LLC v. Am. Family Ins. Co.*, 787 S.E.2d 765, 773 (Ga. Ct. App. 2016) (alterations in original) (quoting *Hines v. State Farm Fire & Cas. Co.*, 815 F.2d 648, 651 (11th Cir. 1987)); *see also Shan Hsu v. Safeco Ins. Co. of Ind.*, 654 F. App'x 979, 980 (11th Cir. 2016). "However, if there are factual questions regarding the degree of the insured's compliance with the insurer's request for information or the reasonableness of the insured's explanation for noncompliance, a jury must resolve whether the insured sufficiently cooperated with the insurer's request." *Id.*

The Georgia Courts have explained when an insurer may obtain summary judgment based on the insured's failure to provide necessary information and when it may not. In *Diamonds & Denims, Inc.*, for example, the Georgia Court of Appeals held that where "an insured cooperates to some degree or provides an explanation for its noncompliance" or where "the insure[r] fail[s] to act with diligence and good faith in securing the necessary information," summary judgment for the insurer is inappropriate. 417 S.E.2d 440, 442 (Ga. Ct. App. 1992). In that case, the plaintiff made a claim under its commercial property and liability insurance policy after a fire destroyed its warehouse. The insurance company made broad general requests for "books and records" per the policy requirement but did not specify any particular documents. *Id*. at 441. The insured explained that the fire destroyed all of its documents and offered to provide alternative documentation during depositions, but the insurance company did not follow up on the offer. *Id*. at 442. The court held that summary judgment for the insurer was inappropriate because "questions of fact remain[ed] concerning appellant's compliance with the policy prerequisites and appellee's diligence in obtaining the needed information." *Id*.

On the other hand, in *Allstate Insurance Company v. Hamler*, the Georgia Court of Appeals declined to find that a fact question existed as to whether an insured that provided some documents her insurer requested complied with the terms of her insurance policy. 545 S.E.2d 12, 15 (Ga. Ct. App. 2001). In that case, an insured homeowner brought breach of contract claims against her insurer for property that someone allegedly stole from her home. *Id.* at 12–13. During the insurance company's investigation of the claim, the insured provided certain documents to the insurer but failed or refused to provide specific other documents the insurance company requested, including federal income tax returns. *Id.* at 13–14. The insured then sued for breach of contract. The court rejected the insured's argument based on *Diamonds & Denims* that "because she provided some documentation requested by Allstate, a fact question exists as to whether she complied with the policy terms." *Id.* at 15. Instead, the court held that the insurance company was entitled to summary judgment because the insured "refused to provide information . . . despite a lengthy and detailed request by Allstate." *Id.*; *see also Halcome v. Cincinnati Ins. Co.*, 334 S.E.2d 155, 157 (Ga. 1985) (holding that, where the insurer suspected fraud, the insureds' refusal to

provide certain information about their finances breached the insurance contract and warranted summary judgment for the insurer).

Like the insurance company in *Hamler*, Harleysville requested specific documents: financial documents supporting C&H's claim for lost business income, including a detailed monthly statement of profit and loss from January 2014 through the present as it became available. (Dkt. 27-2 at 3.) And like the insured in that case, C&H never argued that the requested information was not relevant. Like that insured, C&H failed to provide the requested documents before discovery closed. Harleysville diligently pursued the matter while C&H failed to cooperate. Over a period of nine months, Harleysville repeatedly sent follow up letters requesting that C&H provide the remaining information and documents supporting its lost business income claim. Harleysville eventually closed the claim after C&H failed to respond. C&H offers no excuse or explanation for this failure to respond to C&H's requests. The policy required C&H to comply fully with all terms of the insurance before it brought legal action against Harleysville. But C&H still had not provided information or documents about its profits and losses from the time of the fire through the filing of this action. Harleysville continued

to seek this information during discovery.  (*See* Dkts. 34-1 at 5; 34-2 at 8–9; 34-3 at 3.)  Because C&H violated this condition precedent, it is barred from filing this action for lost business income under the policy.

C&H cites *Travelers Home and Marine Insurance Company v. Castellanos*, 773 S.E.2d 184, 186–87 (Ga. 2015), for the premise that Harleysville must show prejudice resulting from its failure to cooperate before Harleysville can be entitled to summary judgment.  (Dkt. 73 at 7–8.)  *Castellanos* addressed the burden of proof at summary judgment in a very different situation — where an uninsured motorist ("UM") insurance carrier "denied coverage based on a claim that the at-fault driver was not 'uninsured' as defined in the UM policy because the driver's liability carrier had not 'legally denied' coverage."  773 S.E.2d at 185.  The court found that the plaintiff bringing the bad-faith refusal to pay claim had to show that the at-fault driver's carrier's denial of coverage was "legally sustainable" by proving the carrier (a) reasonably requested the insured's cooperation in defending against a claim; (b) the insured willfully and intentionally failed to cooperate; and (c) that failure to cooperate prejudiced the insurer's defense.  *Id.* at 186–87 (quoting *Vaughn v. ACCC Ins. Co.*, 725 S.E.2d 855, 858 (Ga. Ct. App. 2012).  This case, unlike

*Castellanos* and *Vaughn*, does not involve an insured's failure to cooperate in defending against a lawsuit.

Harleysville has been prejudiced by C&H's unexplained, over three-year delay in providing its documents supporting its lost business income claim as discussed. Harleysville requested the information it needed to evaluate Plaintiff's claim for twenty-seven months and then expended resources defending this bad-faith lawsuit.

Because no reasonable jury could find that Harleysville breached the provision for additional coverage for loss of business income, Harleysville is entitled to judgment as a matter of law.

## IV.   Conclusion

The Court **GRANTS in part and DENIES in part** Defendant Harleysville Preferred Insurance Company's Motion for Summary Judgment (Dkt. 27).

**SO ORDERED** this 20th day of September, 2019.

Michael L. Brown
United States District Judge